IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| ANGEL AVALOS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | 21 CV 5330 |
| ) | |
| The CITY OF CHICAGO, Illinois, a municipal ) | Judge |
| corporation and Chicago Police Deputy Chief ) | |
| Antoinette URSITTI # 628, ) | Magistrate Judge |
| ) | |
| Defendants. ) | |

## COMPLAINT

Plaintiff ANGEL AVALOS, by his attorneys, the HAMILTON LAW OFFICE, LLC, makes the following complaint against Defendants the CITY OF CHICAGO ("Defendant CITY") and Chicago Police Deputy Chief ANTOINETTE URSITTI ("Defendant URSITTI"):

### JURISDICTION and VENUE

1. This case is brought pursuant to 42 U.S.C. §1983 and 740 ILCS 174/15(b) and to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution and the Illinois Whistleblower Act.

2. This Court has jurisdiction of the action pursuant to 28 U.S.C. §§1331, 1343, and 1367.

3. Venue is proper under 28 U.S.C. §1391(b). All parties reside in this judicial district and the events giving rise to the claims asserted in this complaint occurred within this district.

### PARTIES

4. ANGEL AVALOS is a resident of Chicago, Illinois and a Chicago Police Officer.

5. At all relevant times, Defendant URSITTI is or was a Chicago Police Officer, employed by Defendant acting under color of law and within the scope of her employment.

6. Defendant CITY is a municipal corporation, duly incorporated under the laws of the State of Illinois, and at all relevant times, was the employer and principal of Defendant URSITTI. Should AVALOS prevail on his federal claim, Defendant CITY must indemnify Defendant URSITTI pursuant to 735 ILCS 10/9-102.

7. Defendant CITY is AVALOS's employer as defined under the Illinois Whistleblower Act.

## FACTS
### The Career of Angel AVALOS

8. Plaintiff Angel AVALOS grew up in the Little Village community and he has been a lifelong resident of Chicago.

9. AVALOS is 50 years old.

10. AVALOS IS a United States Army National Guard veteran.

11. AVALOS became a Chicago Police Officer on September 5, 1995 and he has been a Chicago Police Officer for 26 years.

12. For the first 23 years of his career with the Chicago Police Department ("CPD"), AVALOS worked in the patrol division in the 12th district.

13. Working in the 12th District for 23 years, AVALOS served the community in which he grew up and in which he still resides.

14. During AVALOS's career, he has received numerous awards and commendations.

15. For example, CPD bestowed the Life Saving Award upon AVALOS in approximately 2002 because he stopped a man experiencing a mental health crisis from jumping off the balcony of a 7-story apartment building by grabbing the man's pant leg just before he jumped.

16. In April of 2018, AVALOS applied to become a Firearms Instructor in the Firearms Training Unit of CPD's Education and Training Division.

17. The Minimum Qualifications to be accepted into the Firearms Training Unit included having an acceptable disciplinary record, serving a minimum of seven years as a sworn member of the Department, passing the Illinois State Recruit Mandated Qualification Course of Fire by 90%, and an oral interview.

18. In recommending AVALOS to the Firearms Training Unit, then Commander Stephen Chung noted that AVALOS "has worked in an extremely diverse district which has housing developments, entrenched gang conflicts, and [a] booming entertainment area. He is able to navigate the various assignments with out (*sic*) issue."

19. Commander Chung also noted that AVALOS "has demonstrated a thirst for training and knowledge. He has sought out training on his own time and with his own money to become a better officer/trainer."

20. AVALOS invested significant personal resources to becoming qualified for the Firearms Training Unit.

21. On November 18, 2018 AVALOS was accepted into the Firearms Training Unit and assigned to the Firearms Training Range.

22. The Firearms Training Unit is considered a prestigious assignment within the CPD.

23. As a range instructor, AVALOS trained CPD recruits and officers in the use of their firearms.

24. AVALOS excelled as a range instructor.

25. AVALOS thoroughly enjoyed his work as a range instructor.

### HST Group, Inc.

26. HST Group, Inc. is a private company that holds a federal firearm license and deals in firearms, training, and police equipment.

27. At all relevant times, Sam Hwang ("Hwang") was the president and owner of HST Group, Inc.

28. For approximately one and a half years, from 2019 to 2020, in addition to working full time as a police officer, AVALOS also worked part-time for HST Group, Inc. as an instructor for firearm courses offered by HST Group, Inc.

29. A "Responsible Person" of a company holding a federal firearm license is a person legally authorized to receive, possess, transport, deliver, or otherwise dispose of a firearm for, or on behalf of, the company.

30. AVALOS was designated a "Responsible Person" of HST Group, Inc. which enabled him to legally transport firearms for use in the HST classes he taught.

### Lombard and Hwang's Dispute

31. Like AVALOS, Chicago Police Officer Daniel J. Lombard ("Lombard") was also assigned to CPD's Firearm's Training Unit, worked as an instructor for HST Group, Inc. and was also designated by the company as a "Responsible Person."

32. In June 2019, Lombard and the owner of HST Group, Inc, Sam Hwang, got into a dispute over firearms equipment and money.

33. Lombard and Hwang's relationship deteriorated to the point where they would not speak to each other.

34. Both Lombard and Hwang spoke with AVALOS about their dispute.

35. In August or September 2019, during a telephone conversation, Lombard told AVALOS that he was going to get the ATF and CPD CAGE unit to raid Hwang's home and business in retaliation for what Lombard believed Hwang had done to him.

### AVALOS discloses Lombard's illegal conduct to ATF and CPD investigators

36. On February 13, 2020, ATF agents came to AVALOS's home and interviewed him.

37. During this interview, the ATF agents asked AVALOS about accusations that Lombard had made to them about Hwang.

4

38. AVALOS truthfully told the ATF agents that Lombard was lying and that he was angry with Hwang over a personal dispute between them.

39. AVALOS truthfully told the ATF agents that Lombard was attempting to unlawfully use federal and state law enforcement resources to get even with Hwang.

40. AVALOS's disclosures of Lombard's unlawful conduct to the ATF was outside established CPD channels for reporting misconduct.

41. The next day, on February 14, 2020, AVALOS reported his conversation with the ATF agents to his immediate supervisor, Sergeant Robert Oakes ("Oakes").

42. That same day, AVALOS also submitted a formal To-From memo regarding the ATF interview to Deputy Chief Kevin Johnson.

43. Despite AVALOS's informing the ATF of Lombard's grudge against Hwang, the ATF raided Hwang's home and business.

44. Hwang was not charged with any crimes as a result of these raids.

45. On August 18, 2020, CPD's Bureau of Internal Affairs ("BIA") interviewed AVALOS regarding his February 14, 2020 To-From memo.

46. AVALOS explained the dispute between Lombard and Hwang.

47. AVALOS informed BIA investigators that he had spoken with the ATF regarding Lombard and Hwang's dispute.

48. AVALOS also disclosed to BIA investigators that Lombard had threatened to get the ATF or CPD's CAGE unit to raid Hwang's home and business in retaliation for the dispute between Lombard and Hwang.

### URSITTI Retaliates Against AVALOS for Breaking the Code of Silence

49. On March 1, 2021, Defendant URSITTI was promoted from Commander to Deputy Chief of the CPD's Training and Support Group, including the Firearms Training Unit.

5

50. Within days of her promotion, Defendant URSITTI called AVALOS's immediate supervisor, Sergeant James Buchanan, into her office.

51. Defendant URSITTI berated Sgt. Buchanan about AVALOS's To-From regarding his ATF interview.

52. Three days later, on March 4, 2021, AVALOS was removed from the Firearms Training Unit and dumped back to patrol in the First District.

53. When AVALOS learned of his transfer, he called Sgt. Buchanan and asked him why he was being transferred.

54. Sgt. Buchanan told AVALOS that he was dumped because he made the Academy look bad and he was responsible for getting another officer 30 days. Buchanan told AVALOS that the chain of command felt he had embarrassed them.

55. DEFENDANTS removed AVALOS from the Firearms Training Unit and dumped him back to patrol in retaliation for his disclosures to the ATF and/or his To-From memo regarding his interview with the ATF, and/or his disclosures to CPD's BIA.

56. When a Chicago police officer is removed from a special unit like the Firearms Training Unit and re-assigned to patrol, against his wishes, that is considered in the CPD to be a negative personnel decision.

57. Within the culture of the Chicago Police Department, the term that is used for a re-assignment such as the one that URSITTI arranged for or ordered for AVALOS is a "dump;" as in, "AVALOS was dumped back to patrol."

58. AVALOS's removal or "dumping" from the Firearms Training Unit was because he disclosed to the ATF and BIA that Lombard attempted to and did unlawfully misuse federal and state police resources to retaliate against Hwang.

59. AVALOS's removal from his assignment was an act of retaliation by the CPD in general and by URSITTI in particular.

60. As a result of the illegal retaliation by DEFENDANTS, AVALOS has suffered and continues to suffer loss of overtime compensation, humiliation, embarrassment, anxiety, damage to his reputation, and stress.

61. Lombard forced AVALOS into the position of being a whistleblower about illegal misconduct. Being a police whistleblower causes extreme stress for the whistleblower. Police whistleblowers are often treated by other officers with disdain and mistrust.

62. Instead of protecting and shielding whistleblowers from retaliation, the Defendant CITY allows its police department to formally retaliate against whistleblowers by "dumping" them to unfavorable assignments.

**CPD's Code of Silence**

63. The Chicago Police Department has a long history of engaging in a Code of Silence with respect to officer misconduct.

64. This "Code or Silence" and/or "Blue Shield," wherein officers and supervisors cover up and condone the misconduct and even unlawful conduct of other officers, such as occurred in this case.

65. In August 2015, a Chicago police officer testified in the case of *Spalding v. City of Chicago, et al.,* 12 CV 8777, that instructors at the CPD police academy repeatedly tell officers, "[W]e do not break the code of silence. Blue is Blue. You stick together. If something occurs on the street that you don't think is proper, you go with the flow. And after that situation, if you have an issue with that officer or what happened, you can confront them. If you don't feel comfortable working with them anymore, you can go to the watch commander and request a new partner. But you never break the code of silence."

66. On December 9, 2015, then Chicago mayor, Rahm Emanuel, delivered a speech to the CITY Council in which he admitted that a code of silence exists and has long existed within the Chicago Police Department.

67. Specifically, Former Mayor Emanuel stated: "As we move forward, I am looking for a new leader of the Chicago Police Department to address the problems at the very heard of the policing profession. This problem is sometimes referred to as the Thin Blue Line. Other times it is referred to as the code of silence. It is the tendency to ignore, deny or in some cases cover-up the bad actions of a colleague or colleagues."

68. Former Mayor Emanuel also admitted that "[s]upervision and leadership in the police department and the oversight agencies that were in place have failed."

69. Former Mayor Emanuel also stated that he intended to create a task force, the "Police Accountability Task Force" (PATF): "we announced a task force last week of respected and knowledgeable leaders in criminal justice and police oversight who will conduct a very public and thorough review of our existing system of training, oversight, discipline, accountability, and transparency….They will look at IPRA's record since it was created in 2007 and ask why – out of the hundreds of police shootings in the last eight years – only a handful of them have led to any charges?"

70. In April 2016, the CITY's own task force agreed that a code of silence or blue shield exists within the Chicago Police Department.

71. Specifically, the CITY's own task force concluded, among other things, that the code of silence is "institutionalized and reinforced by CPD rules and polices that are also baked into the labor agreements between the various police unions and the CITY."

72. The United States Department of Justice ("DOJ") also undertook an investigation of the Chicago Police Department and released a report with its findings in January 2017.

8

73. The DOJ report also concluded that a Code of Silence exists within the Chicago Police Department causing officers cover up the misconduct of other officers.

74. The DOJ report quotes a sergeant on the CPD as saying "if someone comes forward as a whistleblower in the Department, they are dead on the street."

75. The DOJ report became the basis of a legal action instituted against Defendant CITY by the Illinois Attorney General's Office, which led to a consent decree intended to reform the Chicago Police Department.

76. In January 2019, Defendant CITY entered into a court-approved consent decree intended to reform the Chicago Police Department.

77. An Independent Monitoring Team ("IMT"), overseen by Judge Robert M. Dow, Jr., assesses the CITY and CPD's compliance with the Consent Decree in biannual reports. (Each report assesses a portion of the paragraphs of the Consent Decree and will assess all paragraphs at the end of three years.) The IMT has so far issued two reports with a clear trend across both: the CITY and CPD have failed to comply with the reform schedule. In the first report, the CITY and CPD failed to meet even preliminary compliance standards for 52 of 67 paragraphs of the Consent Decree. The CITY and CPD missed 37 of 50 deadlines. The CITY's record in the second report was no better. In that report, filed on June 18, 2020, the CITY and CPD missed 52 of 74 deadlines.

78. CPD continues to fail at reforming its unconstitutional practices and the CITY of Chicago continues to be deliberately indifferent to its failures.

79. In this case, the retaliation suffered by AVALOS was the direct result of CPD's Code of Silence. It was the motivation and the reason for his retaliatory transfer to a less desirable position.

**COUNT I**
(42 U.S.C. §1983, First Amendment Retaliation Claim)

80. Each of the preceding paragraphs is re-alleged as if fully restated here.

81. As described above, AVALOS engaged in activity protected by the First Amendment when he cooperated with the ATF's investigation and told them that Lombard was lying.

82. AVALOS's speech involved a matter of great public concern: a Chicago Police Officer misusing federal law enforcement resources to retaliate against someone over a personal dispute.

83. Defendants' attempts to silence AVALOS by dumping him from the Firearms Training Unit to patrol deters him and others from exercising their First Amendment rights and duties in disclosing retaliation and/or discrimination.

84. AVALOS's First Amendment activity concerning his disclosure of Lombard's misconduct was a motivating factor in Defendants' decision to dump AVALOS back to patrol.

85. As a direct and proximate result of Defendants' misconduct, AVALOS suffered damages, including financial, emotional, and damages to his reputation, which will be proven at trial.

**WHEREFORE**, AVALOS prays for a judgment against Defendants in a fair and just amount sufficient to compensate him for his damages, plus punitive damages, as well as court costs, attorney's fees, and such other relief as is just and equitable.

**COUNT II**
(Illinois Whistleblower Act)
740 ILCS 174/5 *et seq.*

86. Each of the preceding paragraphs is re-alleged as if fully restated here.

87. AVALOS believed or had reasonable cause to believe that the misconduct of Lombard when he lied to federal agents to get them to raid Hwang's home and business, including but not limited to, violation of civil rights laws, perjury, obstruction of justice, making a false report, and harassment.

88. AVALOS also believed or had reasonable cause to believe that the misconduct of Lombard violated several CPD rules and regulations.

89. Defendant CITY, through its agents and employees, as described above, have retaliated against AVALOS because he disclosed what he had reasonable cause to believe to be a violation of the law to a government and law enforcement agency. 740 ILCS 174/15(b).

90. AVALOS's disclosure of Lombard's unlawful conduct caused him to be transferred from an assignment he enjoyed and excelled at to a less favorable assignment and less desirable working hours.

91. Defendant CITY's actions in transferring AVALOS are materially adverse to him, and would be to any reasonable employee.

92. AVALOS's treatment by the CITY of Chicago, as described above, has caused him significant stress, professional embarrassment, and anguish about his status within the CPD.

93. As a result of this retaliation, Plaintiff has suffered and will continue to suffer emotional damages, lost wages and benefits, harm to his career and reputation, attorneys' fees and costs, and other damages which will be proven at trial.

**WHEREFORE**, Plaintiff prays for judgment against Defendant CITY and granting Plaintiff:

　　a. Reinstatement to the assignment he had prior to his transfer to patrol or to some other place within the CPD that is agreeable to him, without any loss of pay or benefits;

　　b. Compensation for any other damages sustained including back pay with prejudgment interest, front pay, compensation for lost benefits, and past and future emotional distress;

　　c. Litigation costs, expert witness fees, and reasonable attorneys' fees; and

　　d. Any and all other relief that is just and equitable.

**PLAINTIFF DEMANDS TRIAL BY JURY.**

Respectfully submitted,

ANGEL AVALOS, Plaintiff

By: /s Torreya L. Hamilton
    Attorney for Plaintiff

HAMILTON LAW OFFICE, LLC
53 West Jackson Blvd. Suite 620
Chicago, IL 60604
312.726.3173
tlh@thehamiltonlawoffice.com
Attorney No. 6229397